# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| JAMES STORM SHIRLEY,<br><br>                              Plaintiff,<br>  vs.<br><br>UNIVERSITY OF IDAHO, et al.,<br><br>                            Defendants. | CASE NO. 14cv215-LAB<br><br>**ORDER DENYING MOTION FOR LEAVE TO AMEND; AND**<br><br>**ORDER OF DISMISSAL WITH PREJUDICE** |

Plaintiff James Shirley, who is proceeding *pro se* and *in forma pauperis*, filed his complaint, which was screened and dismissed, and a first amended complaint (FAC), which was also screened and dismissed. Because it appeared unlikely, though not impossible, that Shirley could successfully amend to correct the defects the first two orders had already identified, he was directed to seek leave to amend, if he thought he could do so successfully. He has now filed an *ex parte* motion, and attached his proposed second amended complaint (the "SAC" or "Proposed SAC") as an exhibit.

The Court's latest order of dismissal directed Shirley's attention to several specific defects that a second amended complaint would need to correct. Shirley was also instructed to explain in his *ex parte* motion for leave to amend how his proposed second amended complaint would correct those defects. In particular, Shirley had not pleaded facts showing that he suffered from a "disability" within the meaning of the Americans with Disabilities Act

and the Rehabilitation Act, and he had not shown how the Court was competent to grant the relief he requested.

Ordinarily, leave to amend is freely granted, but it may properly be denied when amendment would be futile. For example, leave to amend may be denied if the defective pleading can be salvaged only by allegations that contradict the original pleading. *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (citing *Redding v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990)). Where, as here, the original pleading included factual allegations showing that the plaintiff was not entitled to relief on certain theories, those theories cannot salvaged simply by omitting the allegations that showed they were defective. In other words, a complaint that lacks sufficient factual allegations cannot be salvaged by making it even less specific. *See, e.g., Ameika v. Moss*, 2014 WL 250347, slip op. at *2 (M.D.Pa., Jan. 22, 2014) (denying plaintiffs leave to amend, where amendment merely represented an attempt to remove specific allegations that showed they had no cause of action).

**Court's Power to Grant Relief**

Shirley's *ex parte* motion fails because Shirley has not shown that the Court has the power to grant him the relief he is seeking. The Court particularly directed him to address this issue. Shirley's claims arise out of Defendants' alleged failure to accommodate his disability by modifying testing requirements.  A significant problem with Shirley's case is that he waited until quite a long time after the alleged violations to bring this suit and to seek injunctive relief. Rather than bringing suit seeking accommodation for examinations he had yet to take, Shirley took all his exams and now wants to correct the lack of accommodation retroactively. The usual procedure is for students seeking accommodation is to seek injunctive relief after accommodations have been denied, but before academic evaluation has taken place. This is because retroactively correcting negative academic records is rarely if ever feasible.  *See Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 437 (6th Cir. 1998) (giving reasons why court would not require college to waive its academic policy and allow plaintiff to retake examination she took without accommodation).

The claim for testing accommodation for classes in which Shirley is no longer enrolled is moot, and not foreseeably likely to recur in future classes.

The injunctive relief Shirley is seeking is no longer accommodation, but essentially a cleanup of his academic record, and the benefits he thinks he would have earned had he been given the accommodations he says were wrongly denied him.  He asks the Court to order the University of Idaho and its College of Law to reinstate him as a student in good standing, give him credit for two semesters of academic work, accept five hours of coursework from the University of Montana College of Law, recalculate his grade point average, and allow him to continue studying at the College of Law as if his grades had been higher than they actually were. But neither Shirley nor the Court nor anyone else can say at this point what the outcome would have been, had he been given the accommodations he now says were wrongly denied. As the Court pointed out in its earlier order of dismissal, determining whether a student is competent in the subjects he studied, determining what his grades would have been had accommodations been offered, deciding which academic requirements he should be required to comply with, and reviewing academic decisions are beyond the competence of this or any court. *See Regents of University of Mich. v. Ewing,* 474 U.S. 214, 225 (1985); *Bd. of Curators of the Univ. of Mo. v.* Horowitz, 435 U.S. 78, 92 (1978) ("Courts are particularly ill-equipped to evaluate academic performance.")  *See also Halpern v. Wake Forest University Health Sciences,* 669 F.3d 454, 462–63 (4th Cir. 2012) (citing cases for the principle that courts are not competent to assess academic qualifications and should defer to schools' judgments).

The Court is mindful that schools are not permitted to use "academic decisions to disguise truly discriminatory requirements," *see Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1048 (9th Cir. 1999),  but that is not at issue here.  Except for one class in which Shirley alleges the professor targeted him because he had complained about a lack of

/ / /

/ / /

/ / /

accommodations,[1] Shirley is not claiming that his grades failed to reflect his actual performance. Nor is he claiming that the College of Law's academic requirements (such as minimum required grade point average) in general are discriminatory. He agrees his academic performance was poor, and argues this was because he was not give the accommodations he wanted.

Shirley wishes to add a claim for future accommodation. He asks that Defendants be ordered to allow him to be a student at the College of Law and to be granted credit through an alternative off-campus program, and suggests several possible programs. He makes clear he does not intend to return to the campus to study. While Shirley could conceivably benefit from such arrangements, they would only be meaningful if he were reinstated as a student in good standing. If he were not reinstated in good standing, he could not benefit.

Without explanation, Shirley included requests for declaratory relief and for injunctive relief for the benefit of others, even though the Court determined it had no jurisdiction to grant either. Neither his motion nor the Proposed SAC explain why the Court does have jurisdiction.

As an additional matter, it appears Shirley was expelled from the University for an honor code violation in a class he was taking as part of his Ph.D. program. (Compl., ¶¶ 23–24; FAC, ¶¶ 47–48.) The state board of education in August of 2013 refused his final appeal. (Compl., ¶ 24; FAC, ¶ 48.) While the allegations hint at some kind of retaliatory conspiracy, the Court pointed out that Shirley failed to plead facts to establish such a conspiracy, and his Proposed SAC omits it altogether. This expulsion effectively prevents

---

[1] Shirley was accused of academic dishonesty on a take-home exam. (Proposed SAC, ¶¶ 44–45.) After the professor made the accusation, Shirley alleges, the professor ignored Shirley and avoided talking to him. (*Id.*, ¶ 45.) Shirley alleges this was the "beginning of the conspiracy to drive [Shirley] out of the legal program" and the poor grade he received was "issued out of nothing more than spite and purely to insure his disqualification from the College of Law became permanent." (*Id.*) Shirley alleges he was partially successful in overturning the allegations. (*Id.*) The Court earlier pointed out to Shirley that merely making a charge of conspiracy wasn't sufficient to state a claim, and that he was required to allege details such as the scope of the conspiracy, who was involved, and what they did. *See Lacey v. Maricopa County,* 693 F.3d 896, 937 (9th Cir. 2012) (en banc). Merely claiming that one professor made an accusation of cheating and that it was the beginning of a conspiracy to drive him out of law school is not enough to state a claim against either the University or the College of Law.

Shirley from being readmitted to the University, whatever the outcome of this case may be. The Court has no authority to order the University to rescind the expulsion based on a claim that is not at issue in this case.

**Futility of Amendment**

Shirley's motion also fails because his proposed amendments, without explanation, contradict earlier allegations. After defects in the original complaint were pointed out to Shirley and it was screened out, Shirley added detail. It is fair to characterize these as changes to the allegations, although the changes were not drastic. The latest proposed changes, however, depart significantly from the allegations in either of the first two complaints, so much so that the earlier and later allegations cannot both be true.

Most notable are the allegations regarding Shirley's condition. The first two complaints described a condition that, although conclusorily alleged to be a disability, did not amount to a disability under the ADA or Rehabilitation Act. But now, in his *ex parte* motion and the Proposed SAC, Shirley characterizes his conditions as being a great deal more serious and limiting than he did before.

According to the original complaint, the "cognitive disorder not otherwise specified" from which Shirley suffers was most likely caused by three concussions he suffered while in high school. (Compl., ¶ 9.) He was diagnosed with this disorder while attending Purdue University in 1993, and was told it was permanent and most likely progressive. (*Id.*) Shirley requested and was given accommodations while attending Purdue, Portland State University, and the University of Montana. (Id., ¶ 10.)

The facts Shirley originally pleaded showed he was capable of reading ordinary materials, and only had difficulty reading complex and lengthy materials. His earlier complaints also made clear he had no trouble with reasoning in general. For example, his original complaint alleges:

> [T]he nature of [Shirley's] disability did not seem to affect his ability with mathematical or quantitative reasoning and as such, it is only under certain circumstances, mainly comprehension of abstract and complex reading passages, that [he] requires his ADA accommodations that are his right under the [act].

1  (Compl., ¶ 10.) The complaint also makes clear Shirley had no trouble functioning in daily

2  life or even preparing for his first midterm. Because his abilities were limited in only a few

3  isolated circumstances, he himself was unaware his reading abilities were limited at all.

> [Shirley] entered [the law school] in the fall semester of 2010 completely naive of such a very defined limitation in his reading/comprehensive skills. As such, he did not immediately notify or seek out reasonable accommodations under the [ADA. He] believed himself to be capable of operating on a level of academic prowess equal to his classmates and it was only upon sitting through his first (and only) mock mid-term exam that he discovered his limitation.

(Compl., ¶ 11.)

In his amended complaint, Shirley changes his tone, suggesting that he realized before entering law school that he had some kind of problem reading long passages. When describing his experience at Montana State University, where he enrolled in 2005, and which he was later forced to leave due to poor academic performance, he originally said he "did not seek out or require accommodations while attending Montana State University" and did not notice any particular difficulties. (Compl., ¶ 10.) When describing the same situation, the FAC says:

> When long, complex word problems of an abstract nature were encountered during qualifying examinations(*as well as law school exams*), he discovered increasing difficulty in keeping facts straight and struggled with the time constraints imposed by these examinations.

(FAC, ¶ 23.) The FAC also enhances the nature of Shirley's condition somewhat.

> [Shirley's] disability seems *most* troublesome under circumstances requiring, but not limited to, comprehension of abstract and complex reading passages. Such limitations require [him] to transcribe and develop extensive written diagrammatic models to ensure that accurate representations of conveyed facts are identified and considered.

(FAC, ¶ 27.)

While these allegations appear in some ways inconsistent with those in his original complaint, the difference pales in comparison with the allegations Shirley proposes to include. Both his motion and the Proposed SAC, without explanation, allege that he suffers from a rather different and far serious condition.

> [Shirley] suffers daily with a significantly diminished capacity to read, comprehend, and assimilate information via the normal visual pathway and

> must instead rely upon extensive compensatory mechanisms including but not limited to construction of detailed diagrams and/or direct rewriting of passages, in longhand. Such compensatory actions require enormous extra time to create but are imperative to permit [Shirley] to identify the facts when reading.

(Proposed SAC, ¶ 19.)

> [Shirley] has experienced documented progressive declination of cognitive and neural function since 1993. [He] suffers from attention deficits, working memory deficits, slow cognitive processing speed, debilitating eye fatigue and sporadic migraine headaches. These impairments substantially limit[ ] the major life activities of, *inter alia*, reading, writing, learning, concentrating, communicating, and the operation of the major bodily functions of the brain and neurological system.

(Proposed SAC, ¶ 21.)

While it is understandable that a plaintiff might forget to include certain details, accidentally omit or misstate facts, or inadvertently give the wrong impression, the proposed new allegations are so radically different that they sound as if they're describing a completely different person. In the earlier versions, Shirley had not had his condition documented since 1993. He didn't know, until he actually sat down to take his first midterm, that he was disabled. He experienced no significant difficulties with reading or reasoning in most circumstances and thought he was able to compete on the same footing with his classmates. The reason he didn't know he was disabled, he said, was that his condition was narrowly circumscribed, and prevented him only from reading and understanding a very small range of specialized reading material. In most circumstances he had no problem. While reading and understanding are major life activities, the Court held, reading only highly demanding and specialized academic materials and understanding law school exam questions are not major life functions. *Compare Webb-Eaton v. Wayne County Comm. Coll. Dist.,* 2013 WL 3835208, at *4 (E.D.Mich., July 24, 2013) ("Properly understood then, learning is a major life function but learning to be a nurse is not. Thus, the inability to pursue a particular course of study does not amount to a substantial limitation in the major life activity of learning.")

Shirley seeks to change his allegations to claim that his ordinary, daily reading and comprehension abilities are significantly diminished, that he suffers from attention and memory deficits, migraines, and debilitating eye strain, and that he requires "enormously

more time" than other people to understand ordinarily reading material. He also alleges that his deterioration since 1993 is well-documented.

Perhaps the new allegations have simply omitted relevant limiting facts (such as what kind of material Shirley has difficulty reading and understanding, how often he suffers from debilitating eye strain, etc.). Perhaps Shirley is simply straining to find new facts that would salvage his complaint. Whatever the explanation, the allegations are irreconcilably contradictory. The earlier allegations describe a condition that is radically different and at odds with the condition the Proposed SAC describes, so much so that if one accepts the earlier allegations, the later ones must be rejected.

Shirley, as he did in earlier pleadings, relies on accommodations he was offered both by other institutions and by the University and College of Law. But the mere fact that he was granted accommodations does not show Shirley was disabled within the meaning of the ADA and Rehabilitation Act. As the Court noted twice before, those acts create floors, not ceilings. Institutions are free to, and often do, accommodate conditions and situations that as a matter of law are not disabilities. Furthermore, state laws and schools' own rules may require more accommodation than federal law does, and schools are permitted to be as generous as they wish when granting accommodations. The fact that Saladin's letter mentions a disability and Shirley's entitlement to accommodations also does amount to an admission that Shirley was or is disabled within the meaning of the ADA and Rehabilitation Act. Nor does the later decision to grant him accommodations show he was disabled within the meaning of these acts. As Shirley himself points out, the school's handbook and policies create internal obligations on the school. (*See, e.g.*, Proposed SAC, ¶ 54.) It does not follow, however, that those obligations have the force of federal law, or that failure to comply with internal policies gives rise to a federal cause of action.

Shirley adds the new argument that he was disabled because, in the opinion of an official at the University of Montana, the paperwork he provided to the University of Idaho showed that he met the ADA's requirements. (Proposed SAC, ¶ 36.)  The opinion of that official, of course, does not have the force of law, and is not binding on the Court. But more

than that, the opinion, as Shirley reports it, is wrong. According to him, the official said he had a "definitive diagnosis of a disability," that there was an established history of accommodations being granted, and that other institutions' granting of accommodations showed he was "generally regarded as being disabled." (*Id.*) According to this reported opinion, that is enough to entitle Shirley to accommodations under the ADA and Rehabilitation Act.

But, as discussed in more detail below, the 1993 testing by Purdue was old and the University of Idaho acted reasonably in asking for newer evidence. The fact that the University of Montana was willing to accept it shows only that the University of Montana was more generous than the University of Idaho; it does not show the University of Idaho acted unreasonably or violated federal law. The second factor Shirley mentions is actually misquoted; under 42 U.S.C. § 12102(1)(b), a disability can be a record of a disabling impairment — not a record of having been granted accommodations. With regard to the third factor, it is true that being regarded as disabled causes a person to be considered disabled within the meaning of the ADA, *see* §12102(1)(c), but that definition supports only to certain types of claims. This section protects people from being discriminated against because they are perceived as disabled, even if they do not have the type of impairment that would render them disabled under §12102(1)(a); it does not entitle people to accommodations based solely on how they are perceived. § 12102(3)(A).

**New Problems**

The Proposed SAC adds allegations that uncover still other problems with Shirley's claims. It makes clear that Shirley first requested accommodations some time after the middle of his first semester of law school, in the fall of 2010. The University of Idaho would not accept medical or cognitive tests from 1993, deeming them outdated, and required Shirley to obtain more up-to-date results. (Proposed SAC, ¶¶ 18, 28–30.) The Proposed SAC alleges that he was referred to the University's own counseling and testing center. It does not allege that outside testing would have been unacceptable; rather, the allegations suggest the only problem with the documentation Shirley offered was that it was too old.

Shirley alleges that he was placed on a "lengthy waiting list" for testing, and encouraged to seek interim accommodations until the tests could be conducted. (*Id*., ¶ 30.) He was told that it might be possible for his testing to be expedited (*id*.), but later alleges he believed his testing <u>would</u> be expedited. (*Id*., ¶ 30.)   By December, he alleges, the testing still had not been conducted, and the College of Law denied interim accommodations. (*Id*., ¶¶ 31–33.) As a result, he alleges, he did poorly on his fall exams and was placed on probation. (*Id*., ¶ 33.) He still did not have the requested accommodations in time for the spring exams, did poorly on them as well, and was told he was being expelled from the College of Law. (*Id*., ¶ 34.) His appeal of this decision was partly successful; the College of Law agreed to grant him credit for his spring courses and to extend accommodations going forward. (*Id*., ¶¶ 40–41.) Even with the accommodations, his academic performance left him on probation. (*Id*., ¶ 42.) His expulsion for honor code violations followed. (*Id*., ¶¶ 44–46.)

"A public agency may require reasonable evidence of a disability before providing accommodations." *Vinson v. Thomas*, 288 F.3d 1145, 1153 (9th Cir. 2002). Shirley's testing results were seventeen years old at the time he asked the University of Idaho to accept them. What is more, the diagnosis was tentative: It said Shirley's condition was probably (though not definitely) caused by concussions he suffered while playing sports during the period 1979 to 1981, and that both "cognitive disability not otherwise specified" and "post-concussive disorder" were both plausible diagnoses. (Proposed SAC, ¶ 17.) The University was therefore entitled to require Shirley to provide more recent testing results.

Shirley alleges that the University's counseling and testing center, through administrative mix-ups, failed to test him on time for him to document his disability before the fall 2010 or spring 2011 examinations. Even accepting this as true, the obligation fell on Shirley, not the University, to provide evidence of his disability in time for him to receive accommodations. The University's obligation to provide accommodations did not begin until Shirley provided it with evidence of his disability. *See Kaltenberger*, 162 F.3d at 437 ("[P]laintiff asserts that the College failed to reasonably accommodate her disability because it was 'involved' in causing a delay in her diagnosis. However, the College was not obligated

to provide accommodation until plaintiff had provided a proper diagnosis. . . .") Shirley could have arranged to be tested either before he enrolled or while he was in law school. In fact he says that in 1993 he was advised to consider periodic testing, to monitor changes in his condition. (Proposed SAC, ¶ 18.)

Shirley's motion relies on a letter by psychologist Steve Saladin, who worked in the University's counseling and testing center. (Motion for Leave to Amend, Ex. A.) That letter is even more harmful to Shirley's position. It provides details Shirley failed to allege, including the fact that Shirley turned in paperwork to request an accommodation in early November, 2010 and the observation that the process requires several months. (*Id*. ("It should be noted that even had he turned in his materials on the first day of class, it is quite probable that he would not have been assessed in time for the fall exam period.")) The letter also explains the administrative mix-up. It says Shirley agreed to undergo testing only if the College of Law turned down his request for accommodations. The letter says Shirley next contacted him in the late spring of 2011, to inquire about testing. When Saladin found out Shirley had not been accommodated and would need to be tested, the center arranged to schedule Shirley for testing. That did not happen until the early fall of 2011. If what the letter says is true (and Shirley, its proponent has not said otherwise), Shirley himself contributed to the testing delays. More importantly, he knew he was not being given the accommodations he wanted, yet remained enrolled and took the exams anyway.

**Diversity Jurisdiction**

The Court's earlier orders noted that diversity jurisdiction was not alleged. The Proposed SAC conclusorily asserts that the parties are diverse. (Proposed SAC, ¶ 2.) The Proposed SAC that his "principal place of residence at the time of filing this complaint" is in Bozeman, Montana.[2] (*Id*., ¶ 4.) But this doesn't create diversity jurisdiction. If the University of Idaho and its College of Law are arms of the state of Idaho, they are not citizens of any

---

[2] The test for diversity jurisdiction is the parties' citizenship, not their principal places of residence. *Kanter v. Warner–Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).The remainder of the complaint, however, implies that Shirley intends to remain in Montana and practice law there.

state for purposes of diversity jurisdiction. *See Abdulla v. University of Ark. at Little Rock*, 550 Fed. Appx. 7 (D.C.Cir., 2013) (affirming dismissal for lack of jurisdiction, because public university, which was an arm of the state, was not a citizen of any state for diversity purposes). *See also Mazur v. Hymas*, 678 F. Supp. 1473, 1476 (D.Id. 1988) (holding that the University of Idaho was arm of the state).  Although this defect was pointed out to Shirley earlier, the Proposed SAC does not address it.

**Conclusion and Order**

For reasons set forth above, the motion for leave to amend is **DENIED**. This action is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

DATED:  December 18, 2014

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge