**EXHIBIT 1**

U.S. COURTS

NOV 1 3 2014

Rcvd_____ Filed _BC_ Time 11:55 am
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

JAMES STORM SHIRLEY
1215 N. 25th Avenue
Apt. 103
Bozeman, MT 59718
Telephone: (503) 351-2580
E-mail: bigskystorm@gmail.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **JAMES STORM SHIRLEY,** | ) | **CASE NO. 14-cv215-LAB** |
| | ) | |
| **Plaintiff,** | ) | **SECOND AMENDED COMPLAINT** |
| | ) | **AND DEMAND FOR JURY TRIAL** |
| **vs.** | ) | |
| | ) | |
| **THE UNIVERSITY OF IDAHO,** | ) | |
| **COLLEGE OF LAW AT** | ) | |
| **THE UNIVERSITY OF IDAHO,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

COMES NOW the Plaintiff James Storm Shirley, for a cause of action against The

University of Idaho and The College of Law at the University of Idaho, and states and alleges as

follows:

## NATURE OF THE ACTION

1. This is an action brought by the above-named Plaintiff for declaratory judgment,

permanent injunctive relief and damages on the following bases:

    a. Americans with Disabilities Act, Subchapter II-Public Services, 42 U.S.C. §12131

et seq. (hereinafter "ADA"), and in particular:

i.  Discrimination against disabled persons, whereby, "No qualified individual with a disability shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

ii.  Public Entity, The term public entity means: (A) any State of Local government; (B) *any department, agency, special purpose district, or other instrumentality of a Sate or States or local government.* 42 U.S.C. §12131(1)(B).

iii.  Refusal and delay in making reasonable accommodations to "Qualified individual with a disability" in rules, policies, practices, or the provision of auxiliary aids and services, when such accommodations are requested by an otherwise eligible and qualified individual to receive such services and participate in programs or activities provided by a public entity. 42 U.S.C. §12131(2);

iv.  Retaliation. "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203(a);

v. Interference, coercion, or intimidation. "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. §12203(b)

v. Rehabilitation Act of 1973, 29 U.S.C. §701 et seq. (hereinafter "Rehabilitation Act") and its implementing regulations.

1

**JURISDICTION AND VENUE**

2  2. This Court has jurisdiction over this action pursuant to 42 U.S.C. §12131-34, §12203,

3 29 U.S.C. §794 (§504) and 45 C.F.R. §84.44(c) (2011).  The amount in controversy exceeds

4 $75,000 exclusive of interests and costs.  Venue is proper in this District in that the claims

5 alleged herein arose in the City of Moscow, County of Latah, and State of Idaho. However, as

6 such location may present an inability to obtain an impartial jury, the Plaintiff is formally

7 requesting that Coeur D'Alene be considered by the court to facilitate an impartial forum to hear

8 claims.

9  3. This Court also has jurisdiction over this action as the parties are diverse, with Plaintiff

10 residing since the inception of this complaint in the State of Montana and the Defendant's

11 residing within the State of Idaho. Thereby, making the Federal Courtroom the only plausible

12 avenue for this claim.

13

**PARTIES**

14  4. The Plaintiff James Storm Shirley (hereinafter "the Plaintiff" or "JSS") is a private

15 individual which it is claimed has been aggrieved in this complaint and his principal place of

16 residence at the time of filing this complaint is 1215 N. 25th Avenue #103, Bozeman, Montana

17 59718. The Plaintiff was a student at the University of Idaho from August 2010 until August

18 2013, enrolled in the joint degree (Ph.D./J.D.) graduate programs in the College of Law and the

19 College of Graduate Studies (Waters of the West-Science & Management emphasis) during this

20 time.

21  5. The Defendant The University of Idaho (hereafter, "Defendant U of I") is a public

22 entity offering educational opportunities in the State of Idaho and is funded by Local, State and

23 Federal funding.  Defendant U of I is an undergraduate/graduate educational institution of

approximately 15,000 students and is located in the Administration Building, Room 105, Moscow, Idaho 83844.  The Defendant U of I is a covered "Public entity" subject to the requirements of the ADA, as provided by 42 U.S.C. §12131(1).

6.  The Defendant The College of Law at the University of Idaho (hereafter "Defendant College of Law") operates as a "quasi" independent College under the University of Idaho banner but subject to its own "honor code" and set of governing regulations. The Defendant College of Law is a public entity offering educational opportunities in the State of Idaho and is funded by Local, State and Federal funding.  Defendant College of Law is a graduate and professional school of approximately 350 students that trains individuals for a career in Law and successful graduates are awarded the Doctor of Jurisprudence (J.D.) degree which permits them to apply for and sit for the bar exam in the state of desired practice. The Defendant College of Law, is located at 875 Perimeter Drive MS 2321, Moscow, Idaho 83844 and is also a covered "Public entity" subject to the requirements of the ADA, as provided by 42 U.S.C. §12131(1).

## STANDING OF PLAINTIFF

7.  The Plaintiff realleges and herein incorporates by reference the allegations set forth in Paragraphs 1-6 above.

8.  The Plaintiff has suffered damages as the result of the Defendants' actions and omissions, including the diversion of the Plaintiff's past and future resources, lost economic opportunity, and the frustration of the Plaintiff's mission to complete his education.

9.  The Plaintiff's mission, as described above, has been frustrated by the Defendants' practices because the Defendants' violations of the ADA communicate to disabled persons that discriminatory practices are permissible whenever a University decides to "eliminate" a student from his curriculum of study. Further, such actions by the Defendant's demonstrate that

1    correctional remedies are only available should the University decide to grant them, which has

2    hampered the Plaintiff's efforts to complete his degrees despite exposing himself to more that

3    $150,000 in educational loans which have found themselves largely in University coffers.

4        10.  The Plaintiff's mission has further been frustrated as the Defendants' violations of

5    the ADA have decimated his chances of securing suitable employment over the past year and

6    will undoubtedly continue so into the future should reinstatement not occur.

7        11.  In order to counteract the frustration of the Plaintiff's mission, the Plaintiff has had to

8    devote significant resources to identify, investigate, document and take action to correct the

9    Defendants' violations of the ADA, including but not limited to the incursion of litigation

10   expenses and loss of ability to complete his degrees.

11       12.  JSS has been forced to relocate from University housing, lost two semester's grades

12   crucial to obtaining employment in his field of expertise, and has been subjected to multiple acts

13   of retaliation by the University as a result of his demands for justice under the ADA. The

14   Plaintiff will incur additional expenses in the future to counteract the lingering effects of the

15   Defendants' violations of the ADA including loss of wage earning potential and an already

16   wasted year in Moscow while diligently pursuing remedy through the required administrative

17   procedures of the both the University and Federal Office of Civil Rights (administrative

18   complaint was determined "too late" by OCR in February 2014), all of which have necessitated

19   this legal action.

20       13.  As a direct result of the Defendants' actions and omissions as described below, the

21   Plaintiff is an "aggrieved person", as that term is defined by the ADA.  42 U.S.C. §12203(a)(b).

22   The Plaintiff has suffered and continues to suffer significant loss and injury; personally,

23   emotionally and financially, and as such has standing to bring this action before this Court.

## GENERAL FACTS AND ALLEGATIONS

14.  The Plaintiff re-alleges and herein incorporates by reference the allegations set forth in Paragraphs 1-13 above.

15.  Plaintiff, James Storm Shirley (hereafter, "JSS") is a former graduate student at the University of Idaho. JSS was accepted to the Ph.D. program in the Waters of the West Program in the College of Graduate Studies at the University in January of 2010, and subsequently the College of Law in July of this same year.

16.  Dating back to 1993, while attending Purdue University and some 16 years prior to matriculating into the University of Idaho/College of Law to begin work on his degrees, JSS was diagnosed as having the disability "cognitive disorder not otherwise specified" (hereafter, CD-NOS) as a result of testing and imaging that took place at both Purdue University and Home Hospital in Lafayette, IN.

17. JSS was informed that his disability "most likely" originated as a result of three serious concussions, which produced unconsciousness and memory lapses. Such events occurred while engaging in high school baseball and football from the years 1979-1981. As such injuries could not *definitively* be determined as the causative agent due to the length of time between the injuries and diagnosis of the disability, the CD-NOS diagnosis was deemed most plausible. However, a parallel diagnosis of "Post-concussive Disorder" was considered as equally applicable due to the lack of any subsequent concussions or traumatic events. Prior to these injuries, JSS possessed extraordinary academic prowess prior to these events, graduating third in his HS class. JSS ceased such activities after the occurrence of the third injury in 1981.

18. JSS was informed in 1993 upon his testing and diagnosis at Purdue that he should expect to experience increases in symptoms and accompanying declination of cognitive abilities over time and that he should consider repeating testing periodically to monitor such changes.

19. As a result of these injuries, JSS suffers daily with a significantly diminished capacity to read, comprehend, and assimilate information via the normal visual pathway and must instead rely upon extensive compensatory mechanisms including but not limited to construction of detailed diagrams and/or direct rewriting of passages, in longhand. Such compensatory actions require enormous extra time to create but are imperative to permit JSS to identify the facts when reading. JSS is disabled according to the Americans with Disabilities Acts as such limitations to his reading and processing of information substantially limit his ability to function in a normal manner compared to the average person.

20. The extra time it takes to prepare for and take exams requires extensive prior preparation on a daily basis. Typically, JSS must read passages *multiple times* to glean the gist of the passage. Such a limitation places inordinate extra demands on JSS in preparing for daily discussion and end of semester exams. Historical accommodations for taking exams include extra time (2x) and a quiet environment "free of distractions" to insure JSS time to utilize his compensatory strategies fully and thus assure that he's permitted the opportunity to demonstrate his knowledge and mastery of subject matter. The extra time/quite setting accommodations insure that he's not discriminated against as a result of his medical/cognitive disability.

21. JSS has Cognitive Disorder-Not Otherwise Specified (*Post-concussional disorder*) and has experienced documented progressive declination of cognitive and neural function since 1993. JSS suffers from attention deficits, working memory deficits, slow cognitive processing speed, debilitating eye fatigue and sporadic migraine headaches. These impairments substantially

limits the major life activities of, *inter alia*, reading, writing, learning, concentrating, communicating, and the operation of the major bodily functions of the brain and neurological system.  He is an individual with a disability within the meaning of 42 U.S.C. § 12102.

22. Post 1993, JSS' CD-NOS disability diagnosis was reaffirmed in 2011 by the University of Idaho's own Counseling and Testing Center Director, Dr. Steve Saladin. Such testing reaffirmed the Purdue findings and is in line with JSS request for reasonable accommodations during his first semester in Law School.

23. Further, JSS has an established history of receiving accommodations for his disability. JSS completed his B.A. degree in December 1995 utilizing the "reasonable accommodations" determined due him by Purdue University. JSS was also permitted reasonable accommodations by previous Colleges including the University of Montana based purely upon the diagnostics provided by Purdue University. Such actions by these Universities further support the assertion that JSS has a disability and worthy of protection under the ADA, as the established history of receiving accommodations at these Universities supports his claim of disability and that such refusal to provide reasonable accommodations by the University of Idaho is a prima facie violation of the Act.

24. JSS did not initially seek out accommodations when enrolling at Montana State University in 2005 for his Ph.D. graduate degree in Environmental Microbiology; instead, believing he'd developed sufficient compensatory mechanism by which to overcome his disability and had thus made his need for reasonable accommodations unnecessary.

25. However, after two failed attempts to pass these preliminary exams at MSU and struggling throughout his program, JSS was forced to abandon his graduate program, which coincided with a protracted divorce that he erroneously perceived to be playing a much larger

1  role in his academic shortcomings than had actually been the case. Thusly, he failed to make the

2  connection with his academic difficulties and his disability while attending MSU.

3       26. As JSS had already made the decision to pursue environmental law at this time; his

4  being disqualified from his Ph.D. program was of little consequence as he was quite eager to

5  start a new life in Idaho, away from his failed marriage and had already made the commitment of

6  completing his Ph.D. at the University of Idaho concurrently with his pursuit of his Law degree

7  via the joint J.D./Ph.D. "Waters of the West" program.

8       27. JSS entered U of I/College of Law in the fall semester of 2010 naïve of the just how

9  far his disability had progressed since Purdue. The limitations his disability was to play in his

10  reading/comprehension/learning skills at the University of Idaho became apparent immediately.

11  JSS did not notify or seek out reasonable accommodations under the Act and instead attempted

12  to forge on without the accommodations to which he was entitled under the Act.

13       28. After enduring his only mid-term exam during late October of his first semester, JSS

14  swallowed his pride and requested and sought out his historical accommodations. Upon being

15  informed by The University of Idaho's Disability Services Department that his Purdue testing

16  results were "outdated," JSS consulted his associate Dean, Helen Albertson.

17       29. JSS informed Dean Albertson of his disability and discussed his immediate need for

18  accommodations. In this meeting, JSS made his request to secure reasonable accommodations

19  known and offered his Purdue test results as proof. Dean refused to review his Purdue testing

20  results and diagnostic report. Instead, Dean Albertson urged JSS to return to Disability Support

21  Services at the University of Idaho for answers.

22       30. Upon returning to Disability Support Services (hereafter "DSS") and it being

23  affirmed that the University of Idaho would not honor his "outdated" testing results, JSS was

referred directly to the Counseling and Testing Center (hereafter "CTC"). JSS was told that CTC might be able to "pull some strings" and expedite "updated" testing under the circumstances. Dr. Steve Saladin was immediately contacted at CTC and JSS related his concerns as to his need for immediate accommodations. JSS was screened and placed upon a "lengthy waiting list" accordingly, but was encouraged to directly contact the College of Law and seek/request accommodations in the interim. Of note, such time period was late October/early November of 2010, a timeline which was affirmed by the Director of the University's Counseling and Testing Center, Dr. Steve Saladin (see attached **Exhibit A**) and still early on during *his first semester in Law school*.

31.  As JSS had already sought out such accommodations by means of Dean Albertson, he shared his concerns with the academic services director, Nancy Luebbert, but to no avail. As finals approached in December, JSS had still not received intake or any sort of testing via CTC despite being under the impression his "testing was to be expedited." In the interim, all such requests for accommodations directly to the College of Law were denied and JSS was forced to prepare for exams without the accommodations he was accustomed to receiving.

32.  JSS was never contacted or tested prior to finals that fall, forcing him into the untenable situation sitting for his exams without the accommodations to which he was entitled.

33.  At the beginning of spring semester 2011, JSS poor performance on his exams the previous fall due to his lack of accommodations became obvious, as exhibited by his 1.58 GPA, which resulted in his immediate placement on probation in the College of Law. JSS attempted to "turn up the heat" on getting his ADA accommodations approved and believed that such testing by the University would occur soon. However, no such testing or interim accommodations ever materialized despite his incessant requests, which had now grown desperate.

34. JSS was forced to take his spring exams under *the identical circumstances as he had the previous fall term*, producing a similar 1.52 GPA for a 1.54 cumulative that subjected him to immediate removal from the college of Law as his GPA was below the 2.0 minimal standard.

35.  As a result of this failure to accommodate by the University of Idaho, JSS was instructed some ½ way through his summer courses at the University of Montana to drop his current summer classes as his spring grades were posted, and such requests added enormous stress to an already tenuous situation. JSS appealed his expulsion from his law program as well as the request that he withdraw from his summer program at the University of Montana. In desperation, JSS sought out the help of the University of Montana's Disability Services office and Bernadine Gantert in July of 2011.

36. Ms. Gantert reviewed JSS disability documents and accommodations history, *the SAME documents as provided to the University of Idaho*, and determined that an emergency situation that warranted immediate accommodations did in fact exist. According to Ms. Gantert, JSS disability was validated by all three criteria considered relevant according to the ADA: 1. A definitive diagnosis of a disability, 2. An established history of such accommodations being in place, and 3. By the fact that JSS was generally regarded as being disabled and therefore worthy of protection under the ADA. JSS having met all three criteria was immediately accommodated.

37.  Ms. Gantert summarily granted JSS *immediate accommodations* at the University of Montana and agreed to contact her counterpart at the University of Idaho, Gloria Jensen, to discuss their failure to reasonably accommodate JSS during his first year at the College of Law.

38. Ms. Gantert's communication resulted in immediate interim accommodations being provided for JSS at the University of Idaho in July 2011, *despite there being no new/updated testing taking place since their denial of JSS accommodations in November of 2010.*

39. Ms. Gantert suggested that the University of Idaho's DSS/CTC consider testing JSS immediately. Further Ms. Gantert "asserted" that the University of Idaho had acted in poor faith and was in violation of JSS civil rights under the Act. Of note, the inclusion of his University of Montana grades from this summer semester, during which time he was accommodated, would have improved his GPS to well above 2.0 and removed him from probation from this point forward. However, such grades were not even permitted to attach to his University of Idaho transcript as it was claimed by the College of Law that such grades occurred while JSS was "on probation" (despite his being given permission to enroll at the University of Montana by Dean Albertson some two months prior) and were therefore "not applicable for transfer" and as such made JSS climb off probationary status all the more difficult and seemingly set up for failure.

40. Simultaneously with Gloria Jensen's granting of "interim accommodations" for the academic year 2011-2012, JSS was required to appeal his disqualification with the College of Law, to which he was *partially* successful. Despite the fact that he had sought reasonable accommodations since October/November of 2010, his first semester in Law school, the faculty in the Law school chose to only provide "credit" for those courses taken in the spring semester as they believed that some ambiguity as to when precisely they had been informed of JSS disability and request for accommodations took place. Despite JSS concerns of being saddled with what was now a 1.52 GPA remaining from his fall term and having been harmed by the University's failure to reasonable accommodate him, JSS was more determined than ever to move forward and climb off probation despite his GPA remaining well below the required 2.0.

41. Moving forward to the end of fall 2011, JSS was able to increase his cumulative GPA to 1.88 on the strength of his 2.33 of the fall semester following his testing and diagnosis by Dr. Saladin as well as FINALLY being granted accommodations as required by the ADA.

42. Unfortunately, there was still the first semester's 1.54 GPA drastically lowering JSS cumulative GPA and keeping him hopelessly anchored in probationary status.

43. JSS received a modest 2.09 for his spring semester grades as despite a contested grade in which JSS received a "D" in a course where he anticipated an "A." JSS contends he was retaliated against as a result of his ongoing concerns and complaints regarding the fact that it took an entire year to receive accommodations and the fact that he'd begun to actively make such failure known to his professors.

44. As a result of this disputed grade, JSS was accused of academic dishonesty on his take home exam in a Native Law course (his primary emphasis area), which resulted in his GPA falling just 2.31 grade points shy of the 2.0 required GPA at 1.96.

45. It took nearly a month before JSS was informed an "honor code" violation had been filed. The rationale for his receiving the "D" grade was an alleged "failed cite" element of one of his exam answers on his take home final exam. During this month, the Professor for this class completely ignored and avoided speaking with JSS, and such an irrational lack of contact is believed to be the beginning of the conspiracy to drive JSS from his legal program. JSS contends that such an abysmal grade was issued out of nothing more than spite and purely to insure his disqualification from the College of Law became permanent. Despite his partial success in overturning the allegations, JSS remained disqualified.

46. JSS's efforts to appeal such disqualification and secure reinstatement to complete his final 18 -27 credits of legal education failed despite the University of Idaho's own director of Counseling and Testing, Dr. Steve Saladin, accepting responsibility for JSS delay in testing and his letter to the College of Law faculty supporting JSS reinstatement under the circumstances as he described in his letter dated August 8th, 2012. Despite Dr. Saladin's own admission of fault in

1  failing to timely test for and approve interim accommodations, the College of Law chose to

2  ignore Dr. Saladin's recommendations and chose to instead uphold JSS' disqualification and

3  such is a clear violation of the ADA and warrants immediate action by the Court.

4         47. As the result of the Defendants' discriminatory and negligent conduct, the Plaintiff

5  has diverted resources, been forced to move, lost substantial economic opportunity, and the

6  ability to complete his two degrees, Ph.D. and J.D. has been thwarted. Of note, JSS lacks *less*

7  *than 15 hours for completion of his law degree* and is *one class and a dissertation from*

8  *completing his Ph.D.* as well.  Such actions have resulted in an unconscionable loss of potential

9  employment revenue and the accumulation of enormous debt to which he has no ability to repay

10 as under his current circumstances as he finds himself in "limbo" and between degrees.

11        48.  Due to the protracted and drawn out nature of the Defendants' conduct, said conduct

12 constitutes an egregious violation of JSS civil rights under the Americans with Disabilities Act

13 and Section 504 of the Rehabilitation Act of 1973.

14 COUNT ONE—DISCRIMINATION ON THE BASIS OF "DISABILITY" IN VIOLATION OF
15 THE AMERICANS WITH DISABILITIES ACT AND IMPLEMENTING REGULATIONS
16
17        49.  The Plaintiff re-alleges and herein incorporates by reference the allegations set forth

18 in Paragraphs 1-48 above.

19        50. The Americans with Disabilities Act and its implementing regulations were designed

20 to prevent discrimination of disabled but otherwise qualified students form achieving success in

21 employment, higher education and various other pursuits.

22        51.  The Defendants have discriminated against the Plaintiff despite there being

23 clarification and guidance in the University of Idaho's Faculty/Student Handbook (hereafter

24 "FSH") which provides that "it is the policy of the regents that equal opportunity be afforded in

25 education and employment to qualified persons regardless of…. disability…." FSH §6010. Such

guidance *should* have guided the Defendants conduct on this matter and theoretically insured their compliance with the ADA. The University's FSH *requires* that "the University shall operate its programs and activities in the most integrated setting appropriate… [presumably] in compliance with the ADA and Section 504 and is intended and shall be construed to afford the protections and rights provided by those laws." FSH §6400.

52. Despite such detailed provisions in the FSH, the Defendant U of I's "overloaded system" (as described by Dr. Steve Saladin) for psychological testing was incapable of performing in the manner to which by law it is supposed to perform. Dr. Saladin state's that "even had he turned in his materials on the first day of class, it is quite probable that he would not have been assessed in time for the fall exam period." *Such a revelation as offered by the University of Idaho's own director of Counseling and Testing is a clear violation of the ADA, §504 of the Rehabilitation Act, and the University's very own Faculty Student Handbook.*

53. The Plaintiff contends that he should have been offered an interim modification pursuant to §6400(B-8) of the FSH in absence of outright approval under the ADA; however, *no such modification was offered or made*, and when the Plaintiff sought such modification directly through the College of Law due to this violation of the ADA, he was once again expressly denied the accommodation to which he was entitled.

54. Additionally, the University's FSH expressly requires it to "make reasonable modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate, or have the effect of discriminating, on the basis of disability, against a qualified student with a disability." FSH §6400(B-1)(a). Significantly, the University's very own FSH provides that "the University will make a reasonable effort to provide interim modifications

to academic requirements and/or interim auxiliary aides while a person's application for aids or services is being reviewed." FSH §6400(B-8).

55.  Despite there being ample guidance within the University of Idaho's carefully crafted Faculty/Student Handbook to address just such a situation as the Plaintiff presents, the Defendants refused to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were found to be necessitated by the Plaintiff's circumstances. Such blatant disregard of these guidance principles offered in the FSH has resulted in a violation of the Plaintiff's civil rights under the ADA and precipitated this action.

56.  Such conduct is believed to have been willful and intentional, and exhibits reckless or callous indifference for the rights of the Plaintiff in his pursuit of reasonable accommodations under the Americans with Disabilities Act of 1990 and §504 of the Rehabilitation Act of 1973.

## COUNT TWO—VIOLATION OF SECTION 504, REHABILITATION ACT OF 1973 AND IMPLEMENTING REGULATIONS

57.  The Plaintiff re-alleges and herein incorporates by reference the allegations set forth in Paragraphs 1-56 above.

58.  The Defendant's are an entity of a program or activity receiving federal financial assistance from the United State government and are therefore subject to the provisions of §504 of the Rehabilitation Act of 1973. 29 U.S.C. §794(a).

59.  The Defendant's have violated §504 of the Rehabilitation Act by refusing to grant Plaintiff interim accommodations when requested and further for failing to grant such accommodations for his diagnosed disability upon substantial proof being provided.

1      60. Such proof included an established history of such accommodations while attending

2  other Universities and the University of Montana. The University of Idaho has violated the

3  Plaintiff's civil rights under the Act by such actions.

4      61.  Such conduct as exercised by the University of Idaho demonstrates willful and

5  intentional harm as well as reckless or callous indifference for the rights of the Plaintiff.

6                                    DAMAGES

7      62.  The Plaintiff re-alleges and herein incorporates by reference the allegations set forth

8  in Paragraphs 1-63 above.

9      63.  As the result of the actions and conduct of the Defendants, as described above, the

10  Plaintiff has suffered significant and irreparable loss and injury including being barred from

11  completion of both is J.D. and Ph.D. degrees. Plaintiff is a mere 12-15 hours from completing his

12  J.D. degree, which he could complete locally in Montana by way of a *semester in practice* and an

13  independent study class. Further, despite being in the final phase of his Ph.D. degree, lacking

14  only a comprehensive exam and approval of his dissertation, JSS has been blocked by means of

15  the retaliatory expulsion described previously.

16      64.  Thereby, the Plaintiff is an "aggrieved person[s]", as defined in 42 U.S.C. §12203,

17  and is an intended beneficiary of the protections and requirements of the statutes, laws and

18  regulations referenced above.

19      65.  The Plaintiff has suffered actual damages as a result of its out-of-pocket expenses,

20  embarrassment, humiliation, deprivation of his civil rights, injury to reputation, pain and

21  suffering, inconvenience, emotional and physical suffering and past diversion of resources.

22      66.  In addition to the injuries suffered by the Plaintiff, the Defendants have also caused

23  significant and irreparable loss and injury including substantial loss of future wages and

1   compensation for such losses by the Plaintiff are not possible as the University will likely be

2   immune from such penalty. This leaves JSS with only injunctive-based reinstatement as his only

3   recourse.

4       67.  The Court should enjoin the Defendants, their officers, employees, agents,

5   successors, and all other persons in active concert or participation with said Defendants, from

6   failing or refusing to comply with all requirements of the ADA and its implementing regulations.

7   <u>PRAYER FOR RELIEF</u>

8       WHEREFORE, the Plaintiff James Storm Shirley, prays that the Court enter judgment

9   against the Defendants as follows:

10       A.  That the Court find and declare that the actions of the Defendants constitute violations

11   of the Americans with Disabilities Act(s) and section 504 of the Rehabilitation Act of 1973;

12       B.  That the Court issue injunctive relief by way of an order demanding that the

13   University of Idaho immediately restore/reinstate JSS to his "good standing" status thus

14   establishing a complete reinstatement of the Plaintiff to the College of Law. Such a reinstatement

15   should include issuing "credit" for not just spring, but also the previous fall semester of his first

16   year of Law school as during BOTH semesters the College of law refused to and failed to

17   accommodate a qualified student. Such and order would enable JSS to complete his degree via

18   the "semester in practice" scenario described previously as he has secured opportunities from at

19   least two firms locally in Bozeman, MT which have expressed interest in supervising him ins

20   such an endeavor. Such a semester, could conceivable result in 12 of his remain 14 college of

21   Law credit hours to be fulfilled, placing him within a single course of completion.

22       C. The court issue an order restoring the Plaintiff's rights and "good standing" status

23   within the College of Graduate Studies, which would subsequently permit his completion of both

degrees referenced above. If such order is issued, the Plaintiff's committee is still assembled and waiting for further action. If such order is issued, JSS is confident that a resolution outside of expulsion from his program can be reached internally between the department and Plaintiff.

D. That Plaintiff be permitted the opportunity to complete any "remaining" coursework for the J.D. portion of his legal studies as a visiting student at either via a videoconference course, or the University of Montana College of Law or other institution that will permit such enrollment if any further class based instruction is deemed necessary.

E. That the court order Defendant College of Law to accept previous 5 hours coursework from the University of Montana College of Law from the summer of 2011 and that such grades be computed into his existing GPA. or at minimum be counted as "credit" toward his Law degree. Such injunctive relief would place Plaintiff in good standing and within a single semester of completion his Law degree.

F. That the Court order that such a "semester in practice" be covered by the University of Idaho so as to limit further financial damage to Plaintiff.

G. That the Court order that JSS Native American Natural Resources class taken in the Spring of 2013 be counted as credit toward his Law degree instead of his doctorate as such a transcript update would permit JSS to complete his legal coursework without returning to Moscow for a single class and thusly would permit JSS to graduate after completion of his "semester in practice" internship.

H. Such remedies as "semester in practice" or videoconference based instruction are tangible in light of the fact that Plaintiff has already *completed 62 credit hours in residence* at the University of Idaho College of Law and all that is *required* to sit for the Montana Bar Exam. Further, as the Plaintiff is no longer residing in Moscow, Idaho, forcing him to return to such a

perceived "hostile" environment is not in his interest. Additionally, as 9 hours are directly admissible from his graduate program and another 5 hours remain in limbo from his summer at the University of Montana Law School as addressed in "E" above, a running total of 76 hours will have already been completed under such a proposed injunctive relief scenario. As such, *14 hours credit is all that remains to reach the required 90*. After subtracting the possible 12 credit hours under the semester in practice scenario, *a mere 2 hours*, which could be satisfied by amending Plaintiff's enrollment in his Native American Natural Resources class from "Graduate" credit to "Law" credit (or videoconference based course), thus producing 91 credit hours on his Law school transcript and making him eligible to graduate (pending completion/acceptance of his upper division writing requirement) is all that would remain. As such, injunctive relief has the potential to right this entire string of wrongs, all without Plaintiff having to spend another day at the University of Idaho College of Law. Such a simple resolution for all parties is the only just method for resolving this convoluted case and would permit the University of Idaho to "save face" while simultaneously allowing the Plaintiff to move forward with his life and goal of practicing environmental law in the State of Montana.

<u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiff demands a trial by jury on all issues.

DATED this 13th day of November, 2014.

_____
JAMES STORM SHIRLEY, Plaintiff

JAMES STORM SHIRLEY, being first duly sworn on her oath, deposes and says:

I am the Plaintiff herein, that I have prepared the foregoing document, know well the contents thereof, and that the facts therein stated are true to the best of my knowledge and belief.

_____

JAMES STORM SHIRLEY

STATE OF MONTANA   )
                   : ss
County of _Gallatin_ )

I, ~~James Storm~~ _Kayle E Quillen_____, a Notary Public for said state, does hereby certify that on the _13th_ day of ~~Octo~~ _November_____, 2014, personally appeared before me JAMES STORM SHIRLEY, who, being by me first duly sworn, declared that he signed the foregoing document as such, and that the statements therein contained are true and accurate as he verily believes.

SEAL

Kayle E Quillen
Notary Public
for the State of Montana
Residing at:
Big Sky, Montana
My Commission Expires:
December 20, 2015

Notary Public in and for the State of _Montana_
Residing at: _Bozeman, MT._
My commission expires: _12/20/2015_